UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

BRIAN BLISS,                          )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )      No. 4:06-CV-917 (CEJ)
                                      )
MICHAEL J. ASTRUE[1],                 )
Commissioner of Social                )
Security,                             )
                                      )
            Defendant.                )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.  Procedural History

On August 6, 2003, plaintiff Brian Bliss protectively filed applications for a period of disability and disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, (Tr. 48-50), and for supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*, (Tr. 249-51), with an alleged onset date of April 15, 2000.  On June 16, 2005, plaintiff withdrew his application for disability benefits under Title II and amended his alleged onset date to August 6, 2003.  (Tr. 44).  After plaintiff's applications were

---

[1]Michael J. Astrue became the Commissioner of Social Security on January 20, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as Defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

denied on initial consideration (Tr. 38-42, 253-57), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 43).

The hearing was held on June 15, 2005. Plaintiff was represented by counsel. (Tr. 258-77). The ALJ issued a decision on October 20, 2005, denying plaintiff's claims. (Tr. 9-11, 12-19). The Appeals Council denied plaintiff's request for review on April 12, 2006. (Tr. 4-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

The ALJ received testimony from plaintiff and Marcella Friend, plaintiff's case manager from Adapt of Missouri, Inc.[2] Plaintiff was then 39 years old. (Tr. 261). He had 12 years of education and a GED. Id. He voluntarily surrendered his parental rights to his young son in the spring of 2004. (Tr. 263-64).

Plaintiff testified that he has a diagnosis of bipolar disorder with psychotic features. He experiences daily auditory hallucinations: he may hear his young son crying, voices calling his name, or animal noises, such as a growling dog. (Tr. 263-65). He reported that he also has daily visual hallucinations: he sees large, solid shadows, someone peeking around a corner at him, or someone looking in at him through a second-story window. (Tr. 265). His medications help him to feel less frightened of these hallucinations. (Tr. 265-66).

---

[2]Adapt of Missouri, Inc., provides specialized services, including supported housing, to forensic clients on conditional release.

Plaintiff pleaded no-contest to charges that he had physically abused his girlfriend's child. (Tr. 266). He stated that he had not committed the charged offense but that he pleaded guilty because, after seven months of incarceration, he "was tired of sitting in jail." (Tr. 267). Shortly after he was released from custody, he entered Dismas House,[3] where he remained for fifteen months. (Tr. 267-68). Upon discharge, he entered a residential care facility where he continued to reside at the time of the hearing. (Tr. 268). Plaintiff testified that he had frequent screaming matches with other facility residents, whom he described as "weirdos," pathological liars, and kleptomaniacs. (Tr. 270).

Plaintiff described Adapt case manager Marcella Friend as his "right arm." She transported plaintiff to medical appointments and helped him with tasks such as finding clothing. (Tr. 271). Plaintiff received a rental subsidy. Id.

Ms. Friend testified that she typically spent four hours a week with plaintiff. (Tr. 273). She accompanied him to his frequent medical appointments and attended meetings at the treatment facility to address plaintiff's belligerent behavior with staff and other residents. (Tr. 276). Ms. Friend described plaintiff as becoming "highly agitated" in response to change. Although his moods could be quite variable, he was frequently depressed. When depressed, he became very quiet, and wanted to sleep; he was not motivated to take care of himself at those times.

---

[3]Dismas House is a halfway house for men released from prison.

(Tr. 274-75). In addition to his psychiatric conditions and interpersonal difficulties, plaintiff had a number of physical problems, including Type II diabetes and obesity; he was awaiting a corneal transplant. He had difficulty walking, possibly secondary to Lithium toxicity, and he had fallen several times. A magnetic resonance imaging (MRI) examination of the knees indicated that he had arthritis in one knee and a tear in the other, requiring physical therapy. It was Ms. Friend's opinion that, in light of all these issues, plaintiff was not capable of working. (Tr. 276).

Plaintiff completed a Disability Report as part of his application. (Tr. 58-65). He listed the following disabling conditions: diabetes, chronic pancreatitis, hyperlipidemia, obesity, severe depression, schizo-affective disorder, and psychosis. These conditions caused tingling in his hands and feet, inability to focus, vision loss, hallucinations, muscle pain and weakness, and insomnia. (Tr. 58).

Plaintiff indicated in his Work History Report that he had previously held jobs as a metal fabricator (1986-88), a custodian (1988-92), a laborer (1992-93), and a woodworker (1997-2000). (Tr. 69-76). A wage report establishes that plaintiff's highest reported earnings occurred in 1988 ($10,229.41) and 1989 ($12,805.56). In subsequent years, he earned less than $10,000, and he had no reported income in 1995, 1996, and 2001. (Tr. 55).

On September 5, 2003, plaintiff completed a Pain Questionnaire. (Tr. 84). He indicated that "most of the time" he

-4-

experienced headaches, muscle and joint pain, and sharp pains in his hands and feet. The pain increased with movement. Pain had limited his activities for one to two years. He was prescribed Ibuprofen, which caused nausea and was not very effective against the pain. Plaintiff's other medications included Prozac,[4] Geodon,[5] Lithium,[6] Seroquel,[7] Accupril,[8] and Glucotrol.[9] (Tr. 86). He indicated that he can complete a money order and count change, but he had never learned how to pay bills or use a checkbook. He was able to do laundry, wash dishes, make a bed, vacuum or sweep, take out the trash, and go to the post office. He could not do home repairs, car maintenance, or yard work. (Tr. 87). He did not shop or prepare meals. Plaintiff explained that his sleep was very broken because he could not find a comfortable position and because

---

[4]Prozac is a psychotropic drug indicated for treatment of, *inter alia*, major depressive disorder. See Phys. Desk. Ref. 1772-72 (60th ed. 2006).

[5]Geodon is a psychotropic drug indicated for the treatment of major depressive disorder. See Phys. Desk Ref. 1801-03 (61st ed. 2007).

[6]Lithium is indicated for the treatment of manic episodes of manic-depressive illness. See Phys. Desk Ref. 1692 (61st ed. 2007).

[7]Seroquel is indicated for the treatment of acute manic episodes associated with bipolar I disorder and schizophrenia. See Phys. Desk. Ref. 691 (61st ed. 2007).

[8]Accupril is an ACE inhibitor prescribed to treat high blood pressure. http://www.drugs.com/accupril.html (last visted Aug. 29, 2007).

[9]Glucotrol is a rand name for Glipizide and is prescribed for the treatment of type 2 diabetes. http://www.nlm.nih.gov/ medlineplus/druginfo/medmaster/a684060.html (last visited on Aug. 29, 2007).

he had racing thoughts. He spent his days sleeping and watching television. He reported that he became confused and easily forgot instructions; he needed reminders to complete chores. He indicated that he had "anger issues" and "patience problems" that caused him difficulty in getting along with other people. He stated that he wished that he could work again, but that he "just couldn't handle it" and could no longer do what he had been trained to do. (Tr. 90).

### III. Medical Evidence

The parties have limited their consideration of the medical record to evidence dated after January 1, 2003. The Court will briefly review the medical records prior to that date.

Plaintiff was hospitalized in 2000 on an emergency basis for acute pancreatitis, secondary to hyperlipidemia; he was also diagnosed with insulin-dependent diabetes, mild obesity, and hypertriglyceridemia, secondary to diabetes. (Tr. 112). In April 2002, plaintiff sought treatment on an emergency basis for pneumonia. (Tr. 127-28). The following day, he was voluntarily admitted for psychiatric treatment after presenting at the emergency room with suicidal ideation, anxiety, and depression. It was opined that plaintiff's decompensation was in reaction to his girlfriend's departure two days earlier. (Tr. 137). Plaintiff was treated with medication and closely monitored. During the course of the four-day admission, his condition stabilized and he reported that he was less depressed. He was discharged with diagnoses of

major depression with psychosis,[10] personality disorder not otherwise specified, alcohol dependency in remission, and marijuana abuse. (Tr. 138). His medications upon discharge were Effexor[11] and Risperdal.[12] (Tr. 129-30, 137-38).

On May 21, 2002, plaintiff began outpatient psychiatric treatment with John Crane, M.D. He stated that he was depressed and was not sleeping well due to racing thoughts and nightmares. He identified a number of stressors: he was living in his truck at the time; his girlfriend, who had bipolar disorder, had obtained an *ex parte* order of protection against him several months earlier; and he was unemployed due to his medical problems. On mental status examination, plaintiff was noted to have a bland affect; there were no obvious psychotic thoughts. (Tr. 144-45).

When plaintiff was seen again on July 9, 2002, he reported that he had a place to live but still was not sleeping well. He had been unable to regain custody of his child. Dr. Crane increased plaintiff's Effexor dosage. (Tr. 145). On October 24, 2002, plaintiff reported to Dr. Crane that he had lost his girlfriend, his truck, and his driver's license. He also reported

---

[10]The treating physician did not explain what symptoms justified the diagnosis of psychotic features. There are no indications that plaintiff reported experiencing hallucinations or distortions of thought.

[11]Effexor is indicated for the treatment of major depressive disorder. See Phys. Desk Ref. 3412 (61st ed. 2007).

[12]Risperdal is the brand name for Risperidone and is indicated for the treatment of schizophrenia and acute manic or mixed episodes associated with bipolar I disorder. See Phys. Desk Ref. 1677 (61st ed. 2007).

that he had been detained in a county jail for unpaid parking tickets; he was released on bond in order to keep his appointment with Dr. Crane. Dr. Crane increased plaintiff's Effexor and Risperdal doses. (Tr. 146). On January 23, 2003, plaintiff was still in custody and was awaiting sentencing on child abuse charges. Dr. Crane described plaintiff as very tense and shaky. Plaintiff reported that he was sleeping only 3 to 4 hours a night and was very tired. (Tr. 147).

Plaintiff was transported to St. John's Mercy Hospital's emergency department on March 12, 2003, complaining of chest pain, dizziness, and numbness in the left arm. (Tr. 150). Urine screens were negative. His diagnoses on discharge were "abdominal pain – etiology to be determined – rule out [gall stones];" history of pancreatitis, and diabetes. (Tr. 151).

On August 11, 2003, and while a resident at Dismas House, plaintiff started receiving psychiatric treatment at the Hopewell Center. (Tr. 157). He described himself as depressed, with poor sleep and difficulty controlling his anger, and rated his mood as 2 on a 10-point scale. He experienced anxiety, fear of death, and sweats, and reported that he was grinding his teeth. He reported seeing shadows and hearing voices prompting him to hurt others. He presented with normal and coherent thought processes; his speech pattern was unremarkable; his mood was anxious at times. (Tr. 157-58). He was diagnosed with bipolar disorder, mixed with psychotic features, and assigned a Global Assessment of Function score of

51.[13]    He was prescribed Effexor, Risperdal, Trazadone,[14] Amitryptyline,[15] and Ativan.[16]  (Tr. 159).

Plaintiff was seen at the Myrtle Hilliard Davis Comprehensive Health Center on August 18, 2003.  (Tr. 169, 174).  Plaintiff reported that he experienced pain in his feet, which he rated at level 6 on a 10-point scale.  He also requested care for his eyes. (Tr. 174).  Plaintiff returned for follow-up one week later on August 25, 2003.  At that time, he reported pain in his chest, legs, and feet, which he rated at 7 to 8.  Id.  On September 3rd, plaintiff was treated for conjunctivitis.  (Tr. 175).

Adapt of Missouri, Inc., accepted plaintiff for community support services on September 9, 2003.  (Tr. 195-99).  Plaintiff reported that he heard "voices, noises, . . . animals growling, babies crying," and saw "flashes of people, [and] ghosts

---

[13]A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[14]Trazodone is a seratonin modulater prescribed for the treatment of depression.  It may also be prescribed for the treatment of schizophrenia, anxiety, and alcohol abuse. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html (last visited on August 29, 2007).

[15]Trazodone is a seratonin modulater prescribed for the treatment of depression.  It may also be prescribed for the treatment of schizophrenia, anxiety, and alcohol abuse. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html (last visited on August 29, 2007).

[16]Ativan is a brand name for Lorazepam and is prescribed to treat anxiety.  http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a682053.html (last visited on Aug. 29, 2007).

-9-

sometimes." His most recent episode occurred shortly before the intake interview. He described his mood as hopeless. (Tr. 196). Plaintiff stated that he drank alcohol to intoxication, and that he had a history of using opiates, barbiturates, sedatives, cocaine, amphetamines, marijuana, and hallucinogens. (Tr. 196-97). Plaintiff reported that he had last used alcohol and marijuana on July 4, 2003. He denied spending money on alcohol or any other substance within the preceding thirty days. (Tr. 197). Plaintiff was oriented times three; his dress, eye contact, and thought content were appropriate; his affect was somewhat restricted; his thought organization was goal-directed and his speech was coherent; his attitude was cooperative. He appeared to have fair judgment, insight, and fund of knowledge. He denied suicidal and homicidal ideation, hallucinations, intrusive memories, flashbacks, and nightmares. (Tr. 197). Plaintiff also indicated that he was able to use public transportation. Plaintiff knew how to purchase groceries and prepare meals. Id. He identified his hobbies as reading, fishing, riding a motorcycle, hiking, camping, and listening to music. (Tr. 198).

A treatment plan was developed by Adapt of Missouri, Inc., with participation from plaintiff, his probation officer, and a psychiatrist. (Tr. 187-99). Plaintiff was diagnosed with bipolar disorder, with psychotic features. (Tr. 187). Plaintiff was assessed as motivated to improve his mental and physical health and able to communicate his needs to others. (Tr. 188). He possessed the cognitive ability to follow his conditions of probation and the

skills to successfully live in the community.  He was able to ambulate independently.  (Tr. 190-91).  He was described as resourceful and having diverse interests.  (Tr. 193).  It was recognized that plaintiff's psychiatric symptoms might interfere with his willingness to interact with others.  Id.

Plaintiff returned to the Davis Health Center for follow-up treatment.  On September 22, 2003, plaintiff reported that he had a headache as well as pain in his hands, feet, and legs, which he rated at 7 on a 10-point scale.  He continued to report pain of similar intensity in his feet and legs in October.  (Tr. 177-78). In December, he reported that he had pain in his left eye, in addition to the pain in his legs and feet.  (Tr. 178).

On December 15, 2003, Elbert H. Cason, M.D., completed a consultative medical examination of plaintiff.  (Tr. 207-10). Plaintiff's conditions included diabetes, chronic pancreatitis, high cholesterol, high blood pressure, sleep apnea, and being overweight.  (Tr. 207-08).  His left eyelid was sutured shut for a corneal treatment process.  His prescriptions included Glucotrol XL,[17]  Accupril,  Lithium  Carbonate,[18]  Doxycycline,  Seroquel,[19]

_____

[17]Glucotrol is a rand name for Glipizide and is prescribed for the treatment of type 2 diabetes.  http://www.nlm.nih.gov/ medlineplus/druginfo/medmaster/a684060.html (last visited on Aug. 29, 2007).

[18]Lithium is indicated for the treatment of manic episodes of manic-depressive illness.  See Phys. Desk Ref. 1692 (61st ed. 2007).

[19]Seroquel is indicated for the treatment of acute manic episodes associated with bipolar I disorder and schizophrenia. See Phys. Desk Ref. 691 (61st ed. 2007).

Fluoxetine,[20] Ibuprofen, Acyclovir,[21] Bacitracin ointment, and a vitamin. Plaintiff reported that he smoked less than one pack of cigarettes a day; he denied use of alcohol or street-drugs. (Tr. 208). Plaintiff had a normal range of motion of the back; his gait and station were normal; he had normal motions of the ankles, knees, elbows and shoulders, and normal strength of the major muscle groups. There was no evidence upon examination of active pancreatitis or gallbladder problems. On mental status examination, plaintiff appeared alert and oriented times three. (Tr. 209). Plaintiff told Dr. Cason that he was scheduled to have a sleep test in the near future. Plaintiff's blood pressure, which he took medication to control, was satisfactory on the day of the examination. Dr. Cason noted that plaintiff did not monitor his blood sugars and thus it was impossible to know how well his medications regulated his diabetes. Dr. Cason also stated that plaintiff would "do well to lose considerable weight." (Tr. 210).

Also on December 15, 2003, Georgia Jones, M.D., completed a consultative psychiatric examination of plaintiff. (Tr. 202-06). Plaintiff reported that he was diagnosed as "bipolar psychotic." He first saw a psychiatrist in 2002, following a breakdown. (Tr. 202). Plaintiff stated that he had a hard time falling asleep but typically slept well once asleep. His concentration and memory were poor, affecting his ability to hold a conversation and to

_____

[20]Fluoxetine is the generic name for Prozac.

[21]Acyclovir is indicated for the treatment of herpes zoster, genital herpes, and chicken pox. See Phys. Desk Ref. 1643 (61st ed. 2007).

read. He described his mood as variable. Dr. Jones noted that plaintiff's "anxiety is up, he gets agitated very easily." Plaintiff stated that he had given up alcohol three years earlier. (Tr. 203). Dr. Jones described plaintiff as providing "little spontaneous speech, but he tried to be coherent, relevant and logical in his answers." (Tr. 204). He had "decreased speed, quantity, quality and productivity to his speech." Id. His affect was blunted. He had no thought disturbances, perceptual distortions, delusions, hallucinations, or suicidal/homicidal ideation. Overall, plaintiff was cooperative with her. Id. Plaintiff indicated that some days he did not get out of bed. He described himself as becoming angry with others and engaging in verbal confrontations. Dr. Jones opined that "this would make it very difficult to interact with supervisors or co-workers because of the irritability and lack of tolerance." (Tr. 205). She also found plaintiff to have diminished concentration, persistence and pace. Dr. Jones diagnosed plaintiff as follows: Axis I – "Major affective disorder, depression, bipolar, psychotic, most recent episode mixed but with no psychotic features;" Axis II – Personality disorder, NOS; Axis III – Hypertension, diabetes, sleep apnea, pancreatitis and corneal ulcer; Axis IV – current psychosocial stressors include avoiding capture; Axis V – GAF = 50-

55.[22]  Dr. Jones opined that plaintiff's prognosis was guarded. (Tr. 205).

On January 13, 2004, consultant Charles A. Pap, Ph.D., completed a Psychiatric Review Technique (Tr. 94-107) and a Mental Residual Functional Capacity assessment (Tr. 108-111).  Dr. Pap determined that plaintiff had bipolar disorder; pathological dependence, passivity, or aggressivity; and marijuana abuse and alcohol dependence.  (Tr. 97, 101, 102).  These conditions resulted in mild restrictions of daily living activities; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and one or two episodes of decomposition of extended duration.  (Tr. 104).  Plaintiff exhibited moderate limitations in three of eight measures of sustained concentration and persistence, in three of five measures of social interaction, and in two of four measures of adaptation. (Tr. 108-09).  No significant limitation was found in the category of understanding or memory.  (Tr. 108).  Dr. Pap noted that in completing the assessment he generally gave significant weight to treating and examining sources, with the exception of consultative examiner Dr. Jones whose opinion of plaintiff's social functioning

---

[22]A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social occupational, or school functioning," while a GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)."  American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders – Fourth Edition, Text Revision</u> 34 (4th ed. 2000).

Dr. Pap found was inconsistent with her objective mental status examination.  (Tr. 106).  Dr. Pap opined that plaintiff should be able to (1) comprehend and carry out at least simple directions, and (2) perform simple tasks of at least 2 to 3 steps in a work environment which has limited social interactions.  (Tr. 110).

On December 16, 2003, plaintiff had the first of several monthly appointments with psychiatrist Franco Sicuro, M.D.[23]  (Tr. 200-35).  Dr. Sicuro noted fluctuations in plaintiff's reports of depression, hallucinations, agitation, and irritability:  on August 10, 2004, Dr. Sicuro wrote that plaintiff had good compliance with his medication and presented as calm and without psychosis; on November 9, 2004, Dr. Sicuro noted that plaintiff exhibited some depression and anxiety; and in February 2005, Dr. Sicuro noted that plaintiff reported some hallucinations.  (Tr. 225, 229, 232).

On July 13, 2004, Dr. Sicuro completed a form entitled "Medical Assessment of Ability to Do Work Related Activities (Mental)."  Dr. Sicuro rated plaintiff's ability as "poor to none" with respect to six out of eight measures of making occupational adjustments;[24] as "fair" on all three measures of making performance adjustments; and as "poor to none" on three out of four measures of making personal-social adjustments.[25]  Dr. Sicuro described

_____

[23]Dr. Sicuro's name sometimes appears in the record spelled "Securo."  The ALJ used the spelling "Secruo."

[24]Dr. Sicuro rated plaintiff's ability to use judgment as "good" and his ability to interact with supervisors as "fair."

[25]Dr. Sicuro noted that plaintiff had a "fair" ability to maintain his personal appearance.

plaintiff's limitations as chronic depression, severe interpersonal difficulties, anger outbursts, poor attention span, and poor social interaction. (Tr. 222-23).

At medical follow-up on December 8, 2004, plaintiff reported that he had fallen and hurt his knees. (Tr. 184). On March 30, 2005, plaintiff complained of pain, frequent falls and dizziness. (Tr. 237). He also had a urinary tract infection. (Tr. 238). On May 9, 2005, the physician noted a possible link between plaintiff's complaints of dizziness and his Lithium dosage. (Tr. 240).

## IV.  The ALJ's Decision

In the decision issued on October 20, 2005, the ALJ made the following findings:

1. Plaintiff had not engaged in substantial gainful activity since August 6, 2003.

2. The medical evidence establishes that plaintiff had the severe impairments of major affective disorder, depression, bipolar, psychotic; and personality disorder, not otherwise specified.

3. Plaintiff was not fully credible in his allegations about the severity of his symptoms and limitations.

4. Plaintiff did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4.

5. Under the special technique for evaluating mental impairments, 20 C.F.R. § 416.920a (2005), plaintiff's severe impairments do not precisely satisfy the diagnostic criteria of Part A. In addition, plaintiff's mental impairments do not meet the Part B criteria. He had no limitations of activities of daily living and moderate limitations of social functioning and of concentration, persistence, or pace. Plaintiff's moderate limitations in concentration, persistence, or pace limit his ability to perform detailed or complex

work, but do not significantly limit his ability to perform simple, repetitive and routine, *i.e.*, unskilled work. Plaintiff had no episodes of decompensation, each lasting for at least two weeks, within one year. His mental impairments do not meet the Part C criteria.

6. Plaintiff had the residual functional capacity (RFC) to perform all work-related activities with the following limitations: Through a 40-hour work week, plaintiff can consistently understand, remember, and carry out no more than simple instructions and can respond appropriately to supervision and co-workers but not the public.

7. Plaintiff was able to perform his past relevant work as a custodian.

8. Plaintiff is a younger individual. 20 C.F.R. § 416.963.

9. Plaintiff has a high school equivalent education. 20 C.F.R. § 416.964.

10. Plaintiff has at best semi-skilled past relevant work experience without transferable skills. 20 C.F.R. § 416.968.

11. Noting Rule 204.00 and Social Security Ruling 85-15, in addition to his past relevant work, there are jobs that exist in the national economy that plaintiff can perform when his vocational factors and residual functional capacity are considered.

12. Plaintiff was not under a disability, as defined in the Social Security Act, at any time through the date of the decision. 20 C.F.R. § 416.920(e) & (g).

(Tr. 18-19).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." <u>Nimick v. Secretary of Health and Human Serv.</u> 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant

is not, he is disabled.  See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A.   **Standard of Review**

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).   "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.   The ALJ's credibility findings;

2.   the plaintiff's vocational factors;

3.   the medical evidence;

4.   the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.   third-party corroboration of the plaintiff's impairments; and

6.   when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  Pearsall, 274 F.3d at 1217, citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

**B.   Plaintiff's Allegations of Error**

Plaintiff's appeal raises the following issues: (1) whether the ALJ properly disregarded the opinion of Dr. Sicuro and properly considered evidence of ongoing mental limitations in making a determination of plaintiff's residual functional capacity; and (2) whether the ALJ properly assessed plaintiff's subjective complaints under the Polaski standards.  Plaintiff does not challenge the ALJ's determination that he has no severe physical impairments.

**1.   The ALJ's determination of plaintiff's Residual Functional Capacity**

Plaintiff argues that, in determining his Residual Functional Capacity, the ALJ improperly discounted Dr. Sicuro's assessment of plaintiff's ability to do work related activities.  Plaintiff also argues that the ALJ improperly dismissed plaintiff's GAF score of 50 to 55.

A claimant's residual functional capacity (RFC) is the most that he can do despite his physical or mental limitations. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); § 404.1545.    It is the claimant's burden, rather than the

Commissioner's, to prove the claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. Id.

As noted above, on July 13, 2004, Dr. Sicuro completed a medical assessment of plaintiff's ability to do work-related activities. He determined that plaintiff had no ability to perform nine out of eighteen listed work-related activities and only fair ability to perform five of the listed skills. (Tr. 222-23). The ALJ gave no weight to this assessment by Dr. Sicuro. The ALJ noted that no examiners observed signs indicative of the severe limitations assessed by Dr. Sicuro, plaintiff performed activities such as going to the post office that were inconsistent with Dr. Sicuro's opinion, and plaintiff's treatment history was not consistent with the limitations Dr. Sicuro described. (Tr. 16).

"Controlling weight" is given to a treating source's opinion if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005), quoting 20 C.F.R. § 416.927(d)(2). "Statements that a claimant could not be gainfully employed are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the

[Commissioner]." Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002) (alteration in original, internal quotations omitted).

In this case, Dr. Sicuro's own treatment notes frequently describe plaintiff as calmer, less irritable, and with some improvement in his symptoms. Furthermore, there is no report from any evaluator, including Dr. Sicuro, that plaintiff ever presented as disoriented, actively hallucinating, or delusional. Examiners and treatment providers consistently described plaintiff as cooperative and appropriate. Plaintiff periodically presented with blunted affect or diminished concentration, persistence or pace, but Dr. Sicuro did not cite any of these symptoms in assessing plaintiff's capacity for work. The Court concludes that substantial evidence in the record supports the ALJ's decision not to give Dr. Sicuro's opinion controlling weight because of its apparent inconsistency with the medical record as a whole.

Plaintiff argues that Dr. Sicuro's evaluation is supported by his psychiatric hospitalization in April 2002. According to the treating psychiatrist, plaintiff's decompensation was an acute response to his girlfriend's recent departure and the removal of his son by DFS. As the ALJ noted, plaintiff's mental impairments had not necessitated any further inpatient treatment, and the Court cannot say that the prior hospitalization creates an inconsistency with the ALJ's finding that plaintiff is not disabled.

Evaluators had periodically assigned a GAF score of 50 to 55. In discussing the GAF, the ALJ stated that it "reflects more than just a person's psychological and psychiatric symptoms but also

reflects the person's life situation as a whole." (Tr. 17). The ALJ noted that evaluators considered various stressors in setting plaintiff's GAF, including "avoiding capture" and economic problems. Plaintiff argues that the ALJ improperly discounted plaintiff's GAF scores, based upon an erroneous belief that the GAF may be based on non-medical factors. The GAF instructions direct evaluators to "Consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Do not include impairment in functioning due to physical (or environmental) limitations." American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders – Fourth Edition, Text Revision</u> 34 (4th ed. 2000). While social stressors are an important consideration for clinicians and evaluators to consider, they are not in and of themselves severe impairments within the meaning of the Social Security Act. In determining the import of plaintiff's GAF scores, it was proper for the ALJ to note that the evaluators considered the impact of specific social stressors on plaintiff's functioning.

Plaintiff asks the Court to consider the following regulation:

*Chronic mental impairments*: Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. For instance, if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate.

20 C.F.R. Pt. 404, Subpt. P, App.1 § 12.00(E).

Plaintiff lives in a residential treatment facility and receives support services from Adapt. The Court recognizes that the purpose of these services is to increase his adaptive functioning and to "reduce" his "symptoms and signs." However, the record does not establish that plaintiff experienced significant symptoms and signs before he began receiving these services. Plaintiff's first reported psychiatric episode occurred in 2002, following the disruption in his relationship with his girlfriend. He has had one comparatively brief hospitalization -- not repeated hospitalizations -- during which medication largely resolved his presenting symptoms. Plaintiff's challenge to the ALJ's RFC determination is without merit.

## 2. The ALJ's credibility determination

In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit articulated five factors for evaluating pain and other subjective complaints: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5) functional restrictions."

The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, the ALJ may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. Where an ALJ explicitly considers the Polaski

factors but then discredits the plaintiff's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).

In the present case, the ALJ found that plaintiff's allegations regarding the severity of his symptoms and limitations were not fully credible. (Tr. 18). The ALJ noted that examiners often observed that plaintiff was alert, cooperative, and oriented. There is no evidence in the medical record that plaintiff was ever observed to be actively psychotic. Plaintiff had not required psychiatric hospitalization since his alleged onset of disability and his symptoms were controlled with medication, without serious side effects. The ALJ also observed that plaintiff's demeanor during the hearing did not lend much to his credibility. Finally, the ALJ addressed plaintiff's work history, noting that plaintiff had earned over $10,000 in only two years of his working life -- 1988 and 1989. (Tr. 15, 55). As defendant notes, plaintiff did not have any income in 1995, 1996, or 2001, years during which he does not claim that he was disabled. (Tr. 55). A claimant's relevant work history may be considered in making a credibility determination. Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006). The ALJ's credibility determinations are adequately explained and supported and thus the Court will uphold them. Ellis v. Barnhart, 392 F.2d 988, 996 (8th Cir. 2005), quoting Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).

## VI.   Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.  therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [#15] is **denied**.

A separate judgment in accordance with this Memorandum and Order shall be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 18th day of September, 2007.